## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALBERT DIAZ, JR.,** | : | **Civil No. 4:16-cv-00358** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Chief Magistrate Judge Schwab)** |
| **v.** | : | |
| | : | |
| **CAROLYN W COLVIN** | : | |
| **Acting Commissioner of** | : | |
| **Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Plaintiff Albert Diaz, Jr. ("Mr. Diaz"), an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits under Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g). This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. *Doc. 20; Doc. 21.*

For the reasons stated herein, we find that the final decision of the Commissioner of Social Security is not supported by substantial evidence. Accordingly, it is ordered that the final decision of the Commissioner denying Mr.

Diaz's claim be **VACATED** and this case be **REMANDED** to the Commissioner to conduct a new administrative hearing pursuant to sentence four of 42 U.S.C. §405(g).

We recommend that, because Mr. Diaz's application for benefits has been pending for almost seven years, the Commissioner schedule an expedited hearing within 120 days of the Court's Order and promptly issue a revised decision.[1]

## II.   Background And Procedural History

This action began as a simple application for Disability Insurance Benefits under Title II of the Social Security Act filed by Mr. Diaz on April 16, 2010. Since that date, Mr. Diaz's claim navigated through a complex procedural labyrinth, where it has been denied and remanded due to multiple defects before it

---

[1] Although we have stopped short of ordering that a time limit be imposed in this case, it is within our authority to do so. *Butts v. Barnhart*, 388 F.3d 377 (2d Cir. 2004) (imposing a time limit where the past delay is of such magnitude that a time limit is imperative); *Barbour v. Astrue*, 950 F.Supp.2d 480, 491 (E.D.N.Y. 2013)(finding that a time limit is appropriate where the claimant's application for benefits had been pending for seven years).

We also note that, following his second administrative hearing, Mr. Diaz raised allegations of individual bias against ALJ Hardiman.  This issue was first raised in Mr. Diaz's brief in this case, however, during oral argument the Commissioner reported that the allegations raised by Mr. Diaz were being investigated in accordance with Social Security Administration policy.  Mr. Diaz was satisfied that the issue would be properly handled by the Social Security Administration, and agreed that this Court need not rule on the merits of this issue.  Nonetheless, we also recommend that, if the Commissioner's inquiries are still ongoing, she consider remanding this case to a new administrative law judge.

arrived before us in the instant matter.  Because we write solely for the benefit of the parties, we need not discuss the procedural history of this case in detail.  As such, we will focus on the issue before us – whether ALJ Hardiman's December 2015 decision denying Mr. Diaz's claim is supported by substantial evidence.

Before May 8, 2008, Mr. Diaz worked in a luxury apartment building as a maintenance director and maintenance worker.  *Admin. Tr. 659; Doc. 6-10 p. 77.* Impartial Vocational Expert Patricia Chilleri ("VE Chilleri") testified that this position was a composite job that involved elements of multiple jobs in the *Dictionary of Occupational Titles* ("DOT") published by the United States Department of Labor.  At its most demanding Mr. Diaz's past relevant work was classified as "very heavy" and "skilled" with a specific vocational preparation ("SVP") level of seven.[2]  *Id.*

---

[2] Very heavy work involves lifting objects weighing more than one-hundred pounds at a time with frequent (between one-third and two-thirds of the work day) lifting or carrying of objects weighing fifty pounds or more.   20 C.F.R. §404.1567(e).

SVP is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  *Dictionary of Occupational Titles, Vol. II* 1009 (4th ed. Rev. 1991) (hereinafter "DOT") *available on Westlaw* at 1991 WL 688702.  Occupations with an SVP of 7 take between two and four years for a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance.  *Id.*  The Commissioner's regulations do not discuss SVP, and instead classify occupations as "unskilled," "semi-skilled,"

This case was initiated based on two applications for benefits that were filed at separate times and then consolidated by order of the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). *Admin. Tr. 689; Doc. 6-11 p. 21*. Mr. Diaz's first application for benefits was filed on April 16, 2010. In his first application for benefits Mr. Diaz alleged that he became disabled on May 8, 2008. Mr. Diaz's second application for benefits was filed on August 13, 2013. In his second application for benefits Mr. Diaz also alleged that he became disabled on May 8, 2008.

On May 8, 2008, when Mr. Diaz was thirty-nine years old, he fell approximately four feet down an elevator shaft while engaging in his duties as a maintenance director and maintenance worker. Mr. Diaz alleges that he landed on his back and elbow. Although the full extent of Mr. Diaz's injuries was not immediately apparent, Mr. Diaz asserts that this injury was the underlying cause of unremitting pain that has driven him to have multiple back and elbow surgeries.

The record in this case reflects that he first sought treatment for his injuries on May 16, 2008, at Holy Name Hospital. *Admin. Tr. 275; Doc. 6-7 p.* 83. He presented to the emergency department with complaints of severe low back pain

---

and "skilled." 20 C.F.R. §404.1568. An SVP level from five through nine corresponds to the Commissioner's definition of "skilled" work. SSR 00-4p, 2000 WL 1898704 at *3.

and elbow pain.   An injection of Toradol relieved his symptoms, and he was prescribed Valium and Percocet. *Admin. Tr. 276; Doc. 6-7 p. 84.*  An X-ray of Mr. Diaz's right elbow was normal. *Admin. Tr. 278; Doc. 6-7 p. 86.*  An X-ray of Mr. Diaz's lumbar spine showed no change from a prior study dated August 13, 2007. *Admin. Tr. 279; Doc. 6-7 p. 87.*  Mr. Diaz was ambulatory on discharge, and was released to work immediately except that he was instructed not to use his injured right arm for one week.  *Admin. Tr. 281; Doc. 6-7 p. 89.*

Only a month later, an MRI revealed some abnormalities in Mr. Diaz's spine that were not apparent on the initial x-ray.   Mr. Diaz was also diagnosed with cubital tunnel syndrome of the right elbow within months of his accident.   Mr. Diaz alleges that as a result of his injuries he cannot bend, twist, squat, lift more than five pounds, reach with his right arm, walk more than twenty feet, climb, kneel, concentrate for more than three minutes at a time, or remember. *Admin. Tr. 835; Doc. 6-14 p. 6.*  It was also noted that, during the June 2015 hearing Mr. Diaz was shaking severely.  *Admin. Tr. 653; Doc. 6-10 p. 70.*  Mr. Diaz's counsel explained that this was due to a spinal nerve stimulator that was surgically implanted in his spine. *Id.*  Mr. Diaz reported that for every thirty minute period, his spinal implant is on for approximately twenty minutes. *Admin. Tr. 655; Doc. 6-10 p. 72.*  Mr. Diaz also has manual control of the device and can turn it off or on

as necessary. *Id.*  Mr. Diaz testified that he has difficulty maintaining focus while his spinal nerve stimulator is active. *Admin. Tr. 656; Doc. 6-10 p. 73.*  Mr. Diaz also asserts that, in addition to the limitations above, he has great difficulty getting up and down, and uses a portable urination device during the day when he is home alone and had no one to assist him to the bathroom in a timely manner. *Admin. Tr. 654*; *Doc. 6-10 p. 71*.

During the relevant period from May 8, 2008, through December 31, 2013, Mr. Diaz was treated by multiple acceptable medical sources and non-acceptable medical sources including surgeons, specialists, physical therapists, and occupational therapists.[3]  *See* 20 C.F.R. §404.1513(listing types of acceptable medical sources); 20 C.F.R. §404.1502(defining treating medical sources).  Mr. Diaz was also examined by nontreating acceptable medical sources, and his records were reviewed by nonexamining acceptable medical sources, in connection with his applications for benefits.  *See* 20 C.F.R. §404.1502(defining nontreating and nonexamining sources).

Mr. Diaz appeared and testified at two administrative hearings.  He was represented by counsel at both hearings.  The first hearing took place on October 5,

---

[3] To be eligible for benefits under Title II of the Social Security Act a claimant must show that he became disabled before his date last insured ("DLI").  ALJ Hardiman found that Mr. Diaz's DLI in this case is December 31, 2013, and Mr. Diaz does not dispute this finding.

2011.  In addition to Mr. Diaz, vocational expert Gerald Keating ("VE Keating") also appeared and testified.[4]  A second hearing took place on June 30, 2015.  A second vocational expert, VE Chilleri testified at this hearing.

On December 21, 2015, the ALJ issued a written decision denying Mr. Diaz's claims.

On February 27, 2016, Mr. Diaz filed a timely appeal in the United States District Court.  *Doc. 1*.  In his complaint Mr. Diaz seeks review of the ALJ's adverse decision, and requests judgment for such relief as this Court deems proper. *Id.*

On April 27, 2016, the Commissioner filed her answer to Mr. Diaz's complaint.  *Doc. 8*.  The Commissioner maintains that the ALJ's decision denying Mr. Diaz's claim was made in accordance with the law and regulations, and is supported by substantial evidence.   *Id.*   Together with her answer, the Commissioner filed a certified transcript of the record of the administrative proceedings in this case.

---

[4] After this administrative hearing, the ALJ denied Mr. Diaz's claim.  Mr. Diaz sought review by the Appeals Council of the Office of Disability Adjudication and review.  His request was denied, and he appealed the ALJ's decision to the U.S. District Court for the Middle District of Pennsylvania.  Magistrate Judge Gerald B. Cohn issued a report recommending that Mr. Diaz's case be remanded back to the Commissioner for a new administrative hearing.  Magistrate Judge Cohn's recommendation was adopted by Judge John E. Jones.  The second administrative hearing was held as a result of this Court's remand order.

This matter has been fully briefed by the parties, and the parties were granted an opportunity to further elaborate on the issues raised in their briefs during oral argument before the Court. *Doc. 11; Doc. 13; Doc. 14; Doc. 21*.

Below we have included a brief summary of the medical treatment Mr. Diaz has received for the primary impairments at issue in this case. Mr. Diaz's physical impairments involve the following three areas of his body: (A) back and hips; (B) right elbow; and (C) abdomen. We also note that, at times during the relevant period Mr. Diaz was receiving simultaneous treatment for his back and right elbow by multiple sources. Due to the complexity of his case, and the need for treatment in multiple areas, Mr. Diaz's surgeries had to be carefully scheduled so that his recovery from one procedure would not impact his recovery for another.

### A. <u>Medical Treatment of Mr. Diaz's Back Impairment</u>

Although an X-ray of Mr. Diaz's lumbar spine taken one month earlier was grossly normal, on June 3, 2008, an MRI of Mr. Diaz's lumbar spine revealed the impression of a small to moderate sized L4-L5 diffuse posterior disc bulge with abutment of the bilateral L5 nerve roots, but no central spinal canal or neural foraminal stenosis. *Admin. Tr. 317-318; Doc. 6-8 pp.* 23-24. The scan also revealed a small disc bulge at the L5-S1 level with minimal abutment of the bilateral S1 nerve roots. *Id.*

On August 13, 2008, Mr. Diaz was examined by orthopedic surgeon Paul P. Vessa ("Dr. Vessa") for evaluation of his back pain. *Admin. Tr. 335; Doc. 6-8 p. 41*. Mr. Diaz had a positive straight leg raise on the right side. Dr. Vessa diagnosed possible disc herniation at L4-L5 on the right side with a failure to improve with conservative care.

On August 22, 2008, Mr. Diaz had another MRI of his lumbar spine. *Admin. Tr. 341; Doc. 6-8 p. 47*. The MRI revealed a rather large right lateral disc herniation at L4-L5 in the neural foramen impinging on the undersurface of the right L4 nerve root. *Id.*

On October 16, 2008, Mr. Diaz underwent the following surgical procedure to address his lateral herniated nucleus pulposus at L4-L5 with right lumbar radiculopathy: extraforaminal decompression right side L4-L5, and application of right L4 nerve root cath. *Admin. Tr. 307-309; Doc. 6-8 pp. 13-15*. Mr. Diaz was discharged from the hospital on the following day. *Id.*

In December 2008, Mr. Diaz reported that, although he did experience some post-surgical improvement, his pain was getting worse. *Admin. Tr. 337; Doc. 6-8 p. 43*. Dr. Vessa noted that a post-surgical MRI scan showed that there was a moderate sized posterior disc bulge, but there was no evidence of central spinal

stenosis and no recurrent disc herniation or any other visible suspicious entries that might be the cause of Mr. Diaz's increased pain. *Id.*

In January 2009, Mr. Diaz returned to Dr. Vessa with complaints of ongoing pain. *Admin. Tr. 338; Doc. 6-8 p. 44.* Mr. Diaz was advised to continue physical therapy.

On February 26, 2009, an EMG and nerve conduction study of Mr. Diaz's lower extremities revealed the impression of subacute right-sided L5 radiculopathy, and mild right S1 radiculopathy. *Admin. Tr. 320; Doc. 6-8 p. 26.*

On March 25, 2009, Mr. Diaz was still complaining of severe pain in his right lower extremity, but a recent MRI showed no evidence of compression of S1 or L5. *Admin. Tr. 333; Doc. 6-8 p.* 39. Dr. Vessa ordered additional imaging, but noted that in the absence of any obvious abnormality he did not believe Mr. Diaz was a candidate for any additional spinal surgeries. *Id.*

An April 2009 MRI of Mr. Diaz's hips was consistent with avascular necrosis of the left femoral head. *Admin. Tr. 339; Doc. 6-8 p. 45.* An MRA of Mr. Diaz's abdomen was normal. *Admin. Tr. 340; Doc. 6-8 p. 46.*

A May 2009 MRI of Mr. Diaz's lumbar spine revealed mild degenerative changes at L1-L2, L4-L5, and L5-S1. *Admin. Tr. 344; Doc. 6-8 p. 50.*

10

On May 11, 2009, Mr. Diaz was evaluated by a second orthopedist, Richard S. Nachwalter ("Dr. Nachwalter").   Dr. Nachwalter noted that his August 2008 post-surgical MRI was of poor quality and was of little use in assessing Mr. Diaz's post-operative condition.   Dr. Nachwalter recommended a new MRI to rule out a recurrence.   *Admin. Tr. 394-95; Doc. 6-8 pp. 100-101*.   Two weeks later Dr. Nachwalter reviewed the new MRI and concluded that there was no recurrent herniation.   *Admin. Tr. 391; Doc. 6-8 p. 97*.   Dr. Nachwalter recommended a diagnostic injection to Mr. Diaz's right SI joint to rule out this area as the source of Mr. Diaz's pain.  *Id.*

On June 25, 2009, Mr. Diaz returned to Dr. Nachwalter after undergoing the right SI injection.   Mr. Diaz reported that the injection improved the clicking and pain in his pelvis but did not help the persistent pain in his right leg and thigh. *Admin. Tr. 389; Doc. 6-8 p. 95*.   Mr. Diaz elected to proceed with a second surgery to address his radicular pain.  *Id.*

On July 24, 2009, Mr. Diaz underwent the following surgical procedures: lumbar laminectomy of L4-L5, fusion of L4-L5 with instrumentation and insertion of an intervertebral device.  *Admin. Tr. 348; Doc. 6-8 p. 54*.

Two weeks after surgery Mr. Diaz reported that his leg pain significantly improved.  *Admin. Tr. 383; Doc. 6-8 p. 89*.  In January 2010, however, he began to

report that he still had some persistent discomfort in his back with mild discomfort in his right leg.  *Admin. Tr. 371-375; Doc. 6-8 p. 78-81.*  The recurrence of his pain prompted him to explore new pain management options.

In May 2010, Mr. Diaz was examined by pain management specialist Phillip Rubinfeld ("Dr. Rubinfeld").  Dr. Rubinfeld recommended that Mr. Diaz consider a spinal nerve stimulator for his back pain.  *Admin. Tr. 411; Doc. 6-8 p. 117.*

On July 30, 2010, Mr. Diaz had a temporary spinal nerve stimulator implanted to determine whether this form of treatment would provide him with any relief.  *Admin. Tr. 462; Doc. 6-9 p. 47.*  After the trial stimulator, Mr. Diaz elected to have a permanent spinal nerve stimulator implanted on October 5, 2010.  *Admin. Tr. 484-85; Doc. 6-9 p. 69.*  Both the temporary and permanent spinal nerve stimulator implants appear to be outpatient procedures.  However, On October 6, 2010, Mr. Diaz presented to the emergency room when he developed a headache, and pressure in his upper back and chest, after surgery.  *Admin. Tr. 538-48; Doc. 6-9 pp. 124-133.*  A CT scan revealed that the stimulator was in good position.  Mr. Diaz was discharged home.  *Id.*

On April 15, 2011, Mr. Diaz had a surgical revision to the placement of his spinal nerve stimulator.  *Admin. Tr. 889-890; Doc. 6-15 pp. 2-3.*  The area of the pulse generator became painful because it was too close to the sacral bone.  The

pulse generator was removed and replaced in an area that would potentially be less painful.

In May 2011, Dr. Rubinfeld noted that Mr. Diaz's pain was controlled and his function was improved. *Admin. Tr. 1044; Doc. 6-17 p. 6*. Dr. Rubinfeld also reported that the severity of Mr. Diaz's pain was moderate, and that when present it interfered only with some daily activities. *Id.*

In June 2011, Dr. Rubinfeld noted that Mr. Diaz had good coverage with the spinal nerve stimulator, and that although Mr. Diaz was having pain in the area of the screws and from the revision surgery the doctor was hopeful that Mr. Diaz could be weaned off of opioid pain medications within four weeks. *Admin. Tr. 1046; Doc. 6-17 p. 8*.

In August 2011, Mr. Diaz reported severe pain that interfered with most, but not all, of his daily activities. *Admin. Tr. 1047-1048; Doc. 6-17 p. 9-10*. Dr. Rubinfeld prescribed a course of nonsteroidal anti-inflammatory drugs in combination with Mr. Diaz's other medications, and noted that this course of treatment is usually effective for complaints like those voiced by Mr. Diaz. *Id.*

In September 2011 Mr. Diaz presented to the emergency room with complaints of flank pain. The staff physician assessed that this pain was due to a muscle spasm. *Admin. Tr. 560; Doc. 6-9 p. 145*; *See also Admin. Tr. 1049-1050;*

13

*Doc. 6-17 pp. 11-12.*   During a follow-up appointment with Dr. Rubinfeld, Mr. Diaz reported that he had extreme pain near the incision for his spinal nerve stimulator that radiated down his back and across his ribs. *Admin. Tr. 1049-1050; Doc. 6-17 pp. 11-12*.   Mr. Diaz reported that the medications provided in the emergency room were effective. *Id.*

In October 2011, Mr. Diaz reported continuing lower back pain and referred pain to the right hip, thigh, and lower leg. *Admin. Tr. 1051-1052; Doc. 6-17 pp. 13-14.*   This pain was noted to be moderately severe, and Dr. Rubinfeld reported that Mr. Diaz's pain, when present, interfered with some daily activities. *Id.*   Dr. Rubinfeld administered an injection for pain that was specifically requested by Mr. Diaz. *Id.*

In November 2011, Mr. Diaz reported slightly less pain, although it was still characterized as moderately severe. *Admin. Tr. 1053-1054; Doc. 6-17 pp. 15-*16. He requested another injection, which he reported had been helpful in the past. *Id.* Mr. Diaz's level of pain remained between moderately severe and moderate, and the course of treatment remained fairly stable with minor medication adjustments through January 2014.   In August 2013, Mr. Diaz was weaned off opioid pain medications and was taking only nonsteroidal anti-inflammatory drugs with Lyrica and Valium. *Admin. Tr. 1017; Doc. 6-17 p. 70.*   Mr. Diaz did report severe pain in

October 2013, but Dr. Rubinfeld noted that a recent hernia repair involving some post-surgical complications contributed to his symptoms. *Admin. Tr. 1111; Doc. 16-17 p. 73*.

### B. Medical Treatment of Mr. Diaz's Right Arm Injury

With respect to his elbow injury, Mr. Diaz was treated conservatively with a combination of physical therapy, and pharmaceutical pain management (including injections) until February 18, 2009. On February 18, 2009, Mr. Diaz underwent the following surgical procedure: right elbow medial epicondylar release with ulnar nerve release at the cubital tunnel only. *Admin. Tr. 358-59; Doc. 6-8 pp. 64-65*. During a follow-up visit on February 23, 2009, Mr. Diaz reported that he had significantly reduced pain in his right elbow. *Admin. Tr. 426; Doc. 6-9 p. 11*. Treating surgeon Glen P. Wainen ("Dr. Wainen") noted that Mr. Diaz should stay away from any kind of heavy lifting, pushing, pulling or squeezing while he recovered. *Id.* On March 30, 2009, Mr. Diaz regained full range of motion in his right arm. *Admin. Tr. 423; Doc. 6-9 p. 8*. On April 30, 2009, Dr. Wainen estimated that Mr. Diaz would be fully recovered from his February 2009 surgery in three months. *Admin. Tr. 424; Doc. 6-9 p. 9*. In June 2009, Mr. Diaz reported that his right elbow felt excellent with the exception of some minor subluxation of his ulnar nerve on flexion and extension. *Admin. Tr. 421; Doc. 6-9 p. 6*. Dr.

15

Wainen assessed that the only reasonable thing to do to stop Mr. Diaz's ulnar nerve subluxation was to have a second surgical procedure called an ulnar nerve transposition. *Id.* Over the following weeks and months Mr. Diaz's right ulnar nerve continued to dislocate upon flexion and extension with increasing frequency until Mr. Diaz made the decision to undergo a second operative procedure.

On February 15, 2010, Mr. Diaz underwent a right ulnar nerve transposition. *Admin. Tr. 443-444; Doc. 6-9 pp. 28-29.* Three days after surgery, Mr. Diaz's sensation in his right arm and hand was intact to light touch, and he was able to cross his fingers and spread them apart. *Admin. Tr. 442; Doc. 6-9 p. 27.* In March 2010, Mr. Diaz had almost a full range of motion, but he had some problems with full extension of his fingers actively. *Admin. Tr. 441-442; Doc. 6-9 pp. 26-27.* Mr. Diaz could passively extend his fingers with no problem. *Id.* In April 2010, Mr. Diaz had good ability to spread and cross his fingers, and extend and make a full fist. *Admin. Tr. 440; Doc. 6-9 p. 25.* In May 2010, Dr. Wainen noted that Mr. Diaz could abduct his fingers with no problem but was experiencing tightness in the flexors of the wrist and fingers. *Admin. Tr. 438; Doc. 6-9 p. 23.* Dr. Wainen prescribed Dyna splints. In June 2010 Dr. Wainen noted that the motion in Mr. Diaz's right wrist, fingers, and elbow was significantly improved. *Admin. Tr. 437; Doc. 6-9 p. 22.*

16

### C. <u>Medical Treatment of Mr. Diaz's Abdominal and Bladder Issues</u>

On September 4, 2013, Mr. Diaz was examined by Dr. Katherine Wheel ("Dr. Wheel") with complaints of a left inguinal hernia.  Mr. Diaz reported that he had been aware of the hernia for approximately two years, but that it was previously asymptomatic.  Mr. Diaz was scheduled for surgery, and had his hernia repaired on September 13, 2013.

Surgical records reflect that, during the procedure to repair Mr. Diaz's inguinal hernia, Dr. Wheel discovered that Mr. Diaz's bladder was herniating through his inguinal canal.  *Admin. Tr. 891-892; Doc. 6-15 pp. 4-5*.  Mr. Diaz's bladder and inguinal hernia were repaired during the procedure.  *Admin. Tr. 893-895; Doc. 6-15 pp. 6-8*.

After the surgery, Mr. Diaz refused to see Dr. Wheel for follow-up care.  *Admin. Tr. 1008-1011; Doc. 6-16 pp. 27-30*.  He was instead monitored by Nicholas Teleo ("Dr. Teleo").  *Id.*  Mr. Diaz reported that his groin was numb and that he had been seen in the emergency room multiple times after the surgery due to urinary tract infections.  *Id.*  Dr. Teleo assessed that the numbness was likely the result of an ilioinguinal nerve injury, and that this injury should not affect his functioning.  *Id.*  In November 2013, Mr. Diaz reported that he was "pretty much

all right." *Id.*   Mr. Diaz was instructed to follow-up in six months, but the record in this case does not include any further treatment notes for this condition.   *Id.*

## D. <u>Medical Opinion Evidence of Record</u>

The Commissioner's regulations provide that evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment.   20 C.F.R. §404.1513.   As of the date of ALJ Hardiman's decision, acceptable medical sources were limited to: licensed physicians, licensed or certified psychologists, licensed optometrist (for vision impairments only), licensed podiatrists (for foot and/or ankle impairments only), and qualified speech or language pathologists (for speech or language impairments only).   *Id.*   The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions.   20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received.   20 C.F.R. §404.1527(c).

Not all medical opinions, however, begin on equal footing.   The Commissioner's regulations direct an adjudicator to consider a number of factors

18

when evaluating medical opinion evidence, including the treating and examining relationship.  *Id.*; *see also* SSR 96-6p, 1996 WL 374180 at *2 ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.").  To facilitate this review, medical sources may be classified based on the following three categories: treating source, nontreating source, and nonexamining source.  20 C.F.R. §404.1502.  A treating source is an acceptable medical source who provides treatment to the claimant.  *Id.*  A nontreating source is an acceptable medical source who has examined the claimant, but does not provide treatment (e.g., a consultative examiner).  *Id.*  A nonexamining source is an acceptable medical source who has never examined the claimant, but provided an opinion.  *Id.*

The following sources provided one or more statements that are considered opinions under 20 C.F.R. §404.1527(a)(2) about Mr. Diaz's physical impairments in this case: treating pain management specialist Dr. Rubinfeld; treating orthopedic surgeon Dr. Vessa; treating orthopedic surgeon Dr. Nachwalter; nontreating physician Thomas McLaughlin ("Dr. McLaughlin"); nonexamining physician Feroz Sheikh (Dr. Sheikh"); and, nonexamining physician Minda Bermudez ("Dr. Bermudez").  The following sources provided one or more statements that are considered opinions under 20 C.F.R. §404.1527(a)(2) about Mr. Diaz's mental

19

impairments in this case: nontreating psychologist Tiffany Griffiths ("Dr. Griffiths"); and, nonexamining psychologist Soraya Amanullah ("Dr. Amanullah").

In addition to considering a source's treating and examining relationship, however, the Commissioner's regulations also direct the ALJ to consider: the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). Apart from the added deference which is typically accorded to a treating source, nothing precludes an ALJ from according greater weight to nontreating or nonexamining source based on the ALJ's consideration of all the relevant evidence of record considered under the factors articulated above.

### 1. Opinions by Treating Source, Dr. Rubinfeld

On April 28, 2009, Mr. Diaz was examined by Dr. Rubinfeld with complaints of lower back pain radiating into his lower right extremity. *Admin. Tr. 404; Doc. 6-8 p. 110.* In his treatment notes, Dr. Rubinfeld commented that Mr. Diaz "suffers from chronic intractable low back, leg pain secondary to

postlaminectomy syndrome and lumbar spine pathology," and that "[d]espite multiple treatment modalities including medications, nerve blocks, and back surgery the patient continues to suffer from severe intractable pain, is limited in his ability to work and perform many activities of daily living." *Admin. Tr. 406; Doc. 6-8 p. 112.* Dr. Rubinfeld made identical statements in his treatment records on May 18, 2010. *Admin. Tr. 411; Doc. 6-8 p. 117.*

On November 14, 2011, Mr. Diaz was examined by Dr. Rubinfeld with complaints of lower back pain radiating into his right lower extremity. *Admin. Tr. 1053-1054; Doc. 6-17 pp. 15-16.* In his treatment notes, Dr. Rubinfeld assessed that Mr. Diaz was "still unable to work due to painful condition." *Id.*

On October 22, 2012, Mr. Diaz was examined by Dr. Rubinfeld with complaints of lower back, neck, and hip pain. *Admin. Tr. 1081-1083; Doc. 6-17 pp. 43-45.* In his treatment notes, Dr. Rubinfeld assessed that Mr. Diaz "remains disabled." *Id.*

On December 17, 2012, Mr. Diaz was examined by Dr. Rubinfeld with complaints of low back, right wrist, and right elbow pain. *Admin. Tr. 1087-1089; Doc. 6-17 pp. 49-51.* Dr. Rubinfeld assessed that Mr. Diaz would be unable to work indefinitely, and commented that Mr. Diaz "continues to suffer from chronic

back pain somewhat helped by the stimulator, meds and lumbar aircast but not enough to allow him to perform the duties of occupation." *Id.*

On March 12, 2015, Dr. Rubinfeld completed a check-box physical residual functional capacity assessment. *Admin. Tr. 1119-1122; Doc. 6-17 pp. 81-84.* Dr. Rubinfeld reported that Mr. Diaz suffered from chronic pain syndrome, post laminectomy syndrome, and right arm pain. He assessed that Mr. Diaz could: sit less than two hours total during an eight-hour workday, stand/walk less than two hours total during an eight-hour workday, and must be permitted to shift positions at will from sitting, standing, or walking and take unscheduled work breaks during the day; never lift or carry any amount of weight; rarely crouch, stoop, twist, climb stairs, or kneel; and rarely be exposed to temperature extremes, dust, humidity, hazards, or fumes, odors, and chemicals. Dr. Rubinfeld also assessed that Mr. Diaz would have significant limitations with reaching, handling or feeling secondary to his right arm impairment, would be off task twenty-five percent or more during a typical workday due to his symptoms, and would be absent more than four days per month.

### 2.  Opinions by Treating Source, Dr. Vessa

On March 25, 2009, Dr. Vessa completed a form for worker's compensation. On that form Dr. Vessa reported that Mr. Diaz was out of work. *Admin. Tr. 334; Doc. 6-8 p. 40*.

On April 15, 2009, Dr. Vessa completed a form for worker's compensation. On that form Dr. Vessa reported that Mr. Diaz was out of work, and could not resume full duty until he was re-evaluated. *Admin. Tr. 343; Doc. 6-8 p. 49*.

On May 6, 2009, Dr. Vessa completed a form for worker's compensation. On that form Dr. Vessa reported that Mr. Diaz was out of work. *Admin. Tr. 342; Doc. 6-8 p. 48*.

### 3.  Opinions by Treating Source, Dr. Nachwalter

In a letter dated May 11, 2009, Dr. Nachwalter reported that Mr. Diaz was "presently unable to work in any capacity." *Admin. Tr. 395; Doc. 6-8 p. 101*.

In a letter dated May 21, 2009, Dr. Nachwalter reported that Mr. Diaz was "unable to work." *Admin. Tr. 392; Doc. 6-8 p. 98*.

In a letter dated June 25, 2009, Dr. Nachwalter reported that Mr. Diaz was "unable to work." *Admin. Yr. 390; Doc. 6-8 p. 96*.

In a letter dated June 29, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 387; Doc. 6-8 p. 93*.

In a letter dated August 3, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work in the post op period." *Admin. Tr. 385; Doc. 6-8 p. 91.*

In a letter dated August 10, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work in the post op period." *Admin. Tr. 383; Doc. 6-8 p. 90.*

In a letter dated September 10, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 381; Doc. 6-8 p. 87.*

In a letter dated October 8, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 379; Doc. 6-8 p. 85.*

In a letter dated November 9, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 378; Doc. 6-8 p. 84.*

In a letter dated December 7, 2009, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 377; Doc. 6-8 p. 83.*

In a letter dated January 7, 2010, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 375; Doc. 6-8 p. 81.*

In a letter dated March 15, 2010, Dr. Nachwalter reported that Mr. Diaz "remains out of work." *Admin. Tr. 373; Doc. 6-8 p. 79.*

In a letter dated April 12, 2010, Dr. Nachwalter reported that he "placed Mr. Diaz on permanent restrictions for his low back of 10 pounds lifting and no repetitive bending or stooping." *Admin. Tr. 371; Doc. 6-8 p. 77.*

24

### 4.  Opinion by Nontreating Source, Dr. McLaughlin

On November 26, 2013, Mr. Diaz was examined by consultative examiner,

Dr. McLaughlin.  After conducting one examination with range of motion testing,

Dr. McLaughlin completed a physical RFC assessment.  *Admin. Tr. 1017-1031;*

*Doc. 6-16 pp. 36-50.*  Dr. McLaughlin reported the impression of failed low back

syndrome with post laminectomy syndrome and continued pain, status post right

elbow injury with markedly decreased range of motion and loss of function, and

tobacco abuse.  Dr. McLaughlin assessed that, despite the limitations resulting

from these impairments, Mr. Diaz could: never lift or carry any object of any

weight; stand two hours at one time without interruption; sit ten minutes at one

time without interruption; walk ten minutes at one time without interruption; stand

for a total of seven hours and thirty minutes per eight-hour day; walk a total of

thirty minutes per eight-hour workday, and required a medically necessary cane for

ambulation that prevents Mr. Diaz from carrying small objects with his free hand;

frequently reach, handle, finger, feel, and push or pull with his left (non-dominant)

hand and arm; never reach, handle, finger, feel, push or pull with his right

(dominant) hand and arm; occasionally use his feet to operate foot controls;

occasionally climb stairs; never climb ladders, climb scaffolds, balance, stoop,

kneel, crouch, or crawl; work in environments with occasional exposure to

humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibration; never work in environments where he would be exposed to unprotected heights or moving mechanical parts, or where he would be required to operate a motor vehicle; and tolerate a moderate level of noise.

### 5.  Opinion by Nonexamining Source, Dr. Sheikh

On September 8, 2010, in connection with the initial administrative review of Mr. Diaz's April 2010 application for disability insurance benefits, Dr. Sheikh reviewed the available medical evidence and assessed Mr. Diaz's physical RFC. *Admin. Tr. 471-477; Doc. 6-9 pp. 56-62.*   Dr. Sheikh reported that the medical evidence of record supported medically determinable impairments of chronic back pain syndrome, degenerative disc disease, status post discectomy and fusion of the lumbar spine, post laminectomy pain syndrome, and ulnar neuropathy status post transposition.  Dr. Sheikh assessed that Mr. Diaz could: frequently lift and/or carry ten pounds, and occasionally lift and/or carry twenty pounds; stand and/or walk (with normal breaks) for a total of four hours per eight-hour workday; sit (with normal breaks) for a total of six hours per eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, climb stairs, climb ramps, climb ladders, climb ropes, and climb scaffolds; and work in and environment free of concentrated exposure to hazards.

### 6.  Opinion by Nonexamining Source, Dr. Bermudez

On January 13, 2014, Dr. Bermudez assessed Mr. Diaz's physical RFC based on the medical evidence of record available at the time. *Admin. Tr. 677-680; Doc. 6-11 pp. 9-12.*  Dr. Bermudez assessed that Mr. Diaz could: frequently lift and/or carry ten pounds, and occasionally lift and/or carry twenty pounds; stand and/or walk (with normal breaks) for a total of four hours per eight-hour workday with the assistance of a medically required hand-held assistive device necessary for ambulation; sit (with normal breaks) for a total of six hours per eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, climb stairs, and climb ramps; never climb ladders, climb ropes, or climb scaffolds; and work in and environment free of concentrated exposure to extreme cold, extreme heat, vibration, and hazards.  Dr. Bermudez also assessed that Mr. Diaz was limited in his ability to reach in front, overhead, or laterally with his right arm, and handle with his right arm.

### 7.  Opinion by Nontreating Psychologist Dr. Griffiths

On December 31, 2013, Mr. Diaz was examined by consultative examiner, Dr. Griffiths.  After conducting one examination, Dr. Griffiths completed a mental RFC assessment.  *Admin. Tr. 1032-1039; Doc. 6-16 pp. 51-58.*  Dr. Griffiths assessed that Mr. Diaz's symptoms were consistent with major depressive disorder

and an unspecified anxiety disorder.  Mr. Diaz appeared to be alert, interactive, and oriented in all spheres.  He walked with a cane, and needed to lie sideways on a couch as a result of his pain while upright.  No behavioral oddities were noted. However, after asking Mr. Diaz to perform serial 7's and digit span tasks, Dr. Griffiths assessed that Mr. Diaz's ability to concentrate was poor.

Dr. Griffiths diagnosed major depressive disorder (recurrent and moderate, and as a result of a physical condition), and unspecified anxiety disorder.  Dr. Griffiths assessed that Mr. Diaz's mental impairments affected his ability to understand, remember, and carry out instructions as follows: moderate difficulty understanding, remembering, and carrying out complex instructions; mild difficulty understanding, remembering and carrying out simple instructions, and no difficulty making judgments on simple or complex work-related decisions.[5]  Dr. Griffiths assessed that Mr. Diaz's mental impairments affected his ability to respond to changes, and interact with supervisors, co-workers, and supervisors as

---

[5] The questionnaire completed by Dr. Griffiths requested that Dr. Griffiths rate Mr. Diaz's capacity for each activity on the following scale: "none" defined as absent or minimal limitations that are transient and may be a normal reaction to a psychological stressor; "mild" defined as a light limitations that does not prevent the claimant from functioning well; "moderate" defined as a more than slight limitation that does not prevent the claimant from functioning satisfactorily; "marked" defined as a serious limitation that results in a substantial loss of ability to effectively function; and, "extreme" defined as a major limitation that prevents any useful ability to function.

follows: moderate difficulty interacting appropriately with supervisors, co-workers, and the public; and mild difficulty responding appropriately to usual work situations and changes in routine.  Dr. Griffiths assessed that these limitations were present in 2008, on Mr. Diaz's alleged onset date.

Dr. Griffiths assessed no more than moderate limitations in any activity.  Per the scale defined on the RFC questionnaire that she completed, a moderate limitation would not prevent Mr. Diaz from functioning satisfactorily in any particular area or activity.

### 8.  Opinion by Nonexamining Psychologist Dr. Amanullah

On January 8, 2014, Dr. Amanullah assessed Mr. Diaz's mental impairments after reviewing the records available on that date.  *Admin. Tr. 675-77, 680-82; Doc. 6-11 pp. 7-9, 12-14*.

First, Dr. Amanullah completed a PRT assessment as outlined in the version of 20 C.F.R. §404.1520a(effective Jan. 13, 2011 to Jan. 16, 2017) in effect when the Commissioner issued her final decision.   Dr. Amanullah assessed that Mr. Diaz's  medically determinable impairments of depressive disorder, social anxiety disorder, and attention deficit hyperactivity disorder resulted in a "mild" restriction of activities of daily living, "moderate" difficulties maintaining social functioning, "moderate" difficulties maintaining concentration, persistence, or pace, and no

repeated episodes of decompensation.  Where the claimant has more than a "mild" degree of limitation in at least one of the first three functional areas, the impairment is generally found to be severe.  *See* 20 C.F.R. §404.1520a(d)(1).

Second, Dr. Amanullah assessed the extent to which Mr. Diaz's medically determinable severe mental impairment affected his ability to engage in basic work activities by completing a mental RFC assessment.  Dr. Amanullah assessed that despite the limitations resulting from his medically determinable mental impairments, Mr. Diaz would be able to perform routine repetitive work activities on a sustained basis, and that he would be able to handle routine changes without special supervision.

### E. <u>Opinion Evidence From Non-Medical Sources</u>

In addition to considering opinion evidence from acceptable medical sources, the ALJ is obligated to consider opinions by non-medical sources.  *See* 20 C.F.R. §404.1529(c)(4); SSR 06-03p, 2006 WL 2329939.  On October 8, 2013, Mr. Diaz's wife, Elizette Diaz ("Mrs. Diaz") completed a third-party questionnaire in which she expressed opinions about Mr. Diaz's functional abilities.  *Admin. Tr. 847-854; Doc. 6-14 pp. 18-25.*  Although these opinions cannot establish the existence of a medically determinable impairment, given her special knowledge of Mr. Diaz, to the extent the ALJ deems them credible, Mrs. Diaz's statements may

provide insight into the severity of Mr. Diaz's impairments and how they affect his ability to function. SSR 06-03p, 2006 WL 2329939 at *2.

Mrs. Diaz reported that she and Mr. Diaz have been married for sixteen years, and reside together in a house. She reported that Mr. Diaz could: lift no more than five pounds; stand up to fifteen minutes at one time; walk up to twenty-five feet at one time; sit more than fifteen minutes at one time; and never squat, bend, kneel, reach or use with his right (dominant) arm. Mrs. Diaz also reported that Mr. Diaz is unable to maintain sufficient concentration to carry out a long conversation, forgets tasks he is supposed to complete, and cannot climb stairs without suffering extreme pain and spasm. She also reported that Mr. Diaz's pain leaves him irritable, and may result in him arguing with others.

## III.   Legal Standards

### A.   Substantial Evidence Review – the Role of This Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence,

but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).   But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."  *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).  The question before this Court, therefore, is not whether Mr. Diaz is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton*

*v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca,* 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); *see also* 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §404.1520(a).   Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."   *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§404.1520(e), 404.1545(a)(1).   In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.   20 C.F.R. §404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents

him or her in engaging in any of his or her past relevant work.  *Mason*, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §404.1512(f); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  *Id.* at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV.  Discussion

### A.  The ALJ's December 2015 Decision Denying Mr. Diaz's Claim

In her December 2015 decision denying Mr. Diaz's claims, the ALJ determined that Mr. Diaz last met the insured status requirements of the Social Security Act on December 31, 2013, and examined Mr. Diaz's claim at each step of the sequential examination process to determine whether Mr. Diaz became disabled before his date last insured.

At step one the ALJ found that Mr. Diaz did not engage in substantial gainful activity between May 8, 2008, and December 31, 2013.

At step two the ALJ must assess whether a claimant's alleged impairments are medically determinable, non-medically determinable, severe, or non-severe. The impairments alleged by Mr. Diaz in this case have resulted in varied diagnoses as these impairments progressed during the relevant period.  In her decision, the ALJ found that Mr. Diaz had the following medically determinable severe impairments: degenerative disc disease/degenerative joint disease of the lumbar spine; status post decompression of L4-L5; laminectomy with fusion L4/L5; and, spinal cord stimulator implant and revision.  Thus, the only medically determinable, severe impairments recognized by the ALJ pertain to Mr. Diaz's back impairment.

36

The ALJ refers to the following impairments as being medically determinable but non-severe: subacute right L5 radiculopathy; mild right S1 radiculopathy.   The ALJ found that there was no evidence that the following impairments met the durational requirement of the Social Security Act, and therefore Mr. Diaz had no medically determinable severe impairment due to the following conditions: upper extremity impairment (i.e., status post epicondylectomy, epiconylar release, and ulnar release and ulnar nerve transportation); hip impairment; abdominal impairment (i.e., inguinal hernia); urinary tract impairment; and, mental impairment (i.e., major depressive disorder/depression/cognitive/intellectual disorders).   The ALJ also found that the following impairments were not medically determinable because the diagnoses themselves are reflective of Mr. Diaz's complaints of pain, and were not based on any objective medical evidence: abdominal pain; post laminectomy syndrome; rule out S1 joint pain; lumbar facet syndrome; discogenic pain; right vascular claudication; chronic pain syndrome; and, right arm pain.

Between steps three and four, the ALJ assessed Mr. Diaz's RFC.   She assessed that, during the relevant period, Mr. Diaz could perform a narrow range of light work treated as sedentary work as defined in 20 C.F.R. §404.1567(a) except:

> He could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk for two hours in an eight hour workday and sit for six

hours (a range of light work treated as sedentary herein). He does require a sit/stand option at the will or direction of the individual. The claimant can perform no right upper extremity pushing/pulling and no bilateral lower extremity pushing/pulling. He is limited to occasional climbing, balancing and stooping, and can never climb on ladders. The claimant cannot kneel, crouch or crawl and perform no right overhead reaching. He must avoid exposure to vibration and hazards. He is limited to simple, routine tasks which are low stress as defined as only occasional decision-making and only occasional changes in the work setting.

*Admin. Tr. 596; Doc. 6-10 p. 13.*

At step four the ALJ's findings were informed by VE Chilleri's testimony. The ALJ found that Mr. Diaz could not engage in his past relevant work as a working supervisor/maintenance director because the physical demands of that work exceeded Mr. Diaz's functional capacity during the relevant period. At step five, the ALJ's findings were informed by VE Chilleri's testimony, and were based on the ALJ's evaluation of this testimony together with the ALJ's RFC assessment and Mr. Diaz's other vocational factors (age, education, and work experience). VE Chilleri testified that an individual with the same vocational characteristics as Mr. Diaz, and the RFC assessed by the ALJ could engage in work as an information clerk (DOT #237.367-046), credit authorizer/checker (DOT #237.367-014), and video monitor (DOT #379.367-010). *Admin. Tr. 661; Doc. 6-10 p. 78.* Relying on this testimony, the ALJ concluded that Mr. Diaz could engage in other work that

existed in the national economy during the relevant period, and therefore was not disabled under the Social Security Act.

### B. Guidelines for the Use of Vocational Expert Testimony in Social Security Disability Cases

At the final step of the sequential evaluation process, "the ALJ often seeks advisory testimony from a vocational expert." *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002). Generally, the ALJ will also consult the DOT, a publication that the Social Security Administration has recognized as a source of reliable data about the physical and mental activities required to perform thousands of occupations. 20 C.F.R. §404.1566; SSR 00-4p, 2000 WL 1898704. SSR 00-4p provides that, before relying on VE testimony to support a disability determination or decision, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE's testimony and the information provided in the DOT, and must resolve any apparent conflict before relying on the VE's evidence to support his or her determination or decision. SSR 00-04p, 2000 WL 1898704. If any conflict becomes apparent during the administrative hearing, the adjudicator must: (1) identify the conflict; (2) elicit a reasonable explanation for the conflict between occupational evidence provided by the VE and the information in the DOT; and (3) explain in his or her decision how the conflict was resolved. *Id.*

The Third Circuit has declined, however, to adopt a rule that any unexplained conflict between a VE's testimony and the DOT requires reversal. Inconsistencies need not be fatal if substantial evidence exists in other portions of the record that can form an appropriate basis to support the result reached by the adjudicator. *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2003). For example, in *Jones v. Barnhart*, the Third Circuit found that substantial evidence existed to support an ALJ's conclusion that a claimant was not disabled where the DOT description of one of the three jobs identified by the VE would have been precluded by the ALJ's RFC assessment. *Jones v. Barnhart*, 364 F.3d 501, 505-06 (3d Cir. 2004). In *Jones*, the Court also emphasized that the VE was clear that the three occupations identified were "merely examples" and not a complete list of the occupations that the claimant could perform. *Id.*; *see also Rutherford v. Barnhart*, 399 F.3d 546, 557-558 (3d Cir. 2005).

## C. The Use and Analysis of the GED Reasoning Level In the Adjudication of Social Security Disability Claims

In its description of the qualifications to perform a particular occupation the DOT includes a General Education Development ("GED") level, and an SVP level. As noted by VE Chilleri, these are two similar but distinct concepts.

The SVP levels are referenced in the Commissioner's regulations and are routinely accounted for during disability proceedings by determining whether the

40

claimant can engage in skilled, semi-skilled, or unskilled work.   20 C.F.R. §404.1568; *see also* SSR 00-4p, 2000 WL 1898704 at *3.   SVP is defined as the *amount* of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed to average performance in a specific job-worker situation.   United States Department of Labor, *Dictionary of Occupational Titles Vol. 2*, 1009 (4th ed. Rev. 1991) *available on Westlaw* 1991 WL 688702 (hereinafter "DOT Vol. 2").   "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."   SSR 00-4p, 2000 WL 1898704 at *3.

Unlike SVP, GED embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.   *DOT Vol. 2* 1009 *available on Westlaw* 1991 WL 688702.   GED is broken into three categories: (1) reasoning development; (2) mathematical development; and (3) language development.   Reasoning Development is assessed on a six-level scale. Of notable import in this case, occupations with a GED reasoning development level of 3 require that a worker be capable of applying "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and dealing "with problems involving several concrete variables in or from

41

standardized situations."   DOT Vol. 2, 1011 *available on Westlaw at* 1991 WL

688702.  Occupations that require a GED reasoning development level of 2 require

that a worker be capable of applying "commonsense understanding to carry out

detailed but uninvolved written or oral instructions," and dealing "with problems

involving a few concrete variables in or from standardized situations."   *Id.*

Occupations that require a GED reasoning level of 1 require that a worker be

capable of applying "commonsense understanding to carry out simple one- or two-

step instructions" and dealing "with standardized situations with occasional or no

variables in or from these situations encountered on the job."  *Id.*

Although the Social Security Administration does not typically rely on a

GED score to conclude whether a claimant can perform a particular occupation, as

explained in the following excerpt from an internal memorandum cited by the

parties in this case, the ALJ should consider GED ratings that appear to conflict

with a claimant's RFC:

> We do not rely on these [GED] ratings to conclude whether a claimant
> can perform a particular occupation when we cite occupations that
> demonstrate the ability to do other work.   However, adjudicators
> should consider GED ratings that may appear to conflict with the
> claimant's RFC and the cited occupation(s); for example, an
> occupation with the GED reasoning level of 3 or higher for a claimant
> who is limited to performing simple, routine, or unskilled tasks.

Social Security Administration Memorandum No. 09-2139 (Dec. 28, 2009)

*available at http://www.skilltran.com/pubs/ssa_2009_ElectronicReferences.pdf*

(last visited Feb. 21, 2017) (hereinafter "SSM 09-2139"). Furthermore, the mere

fact that an occupation is "unskilled" and therefore within a claimant's SVP does

not neutralize or supplant a reasoning level conflict. *McHerrin v. Astrue*, No. 09-

2035, 2010 WL 3516433 at *6 (E.D.Pa. Aug. 31, 2010).

### D. <u>Whether The ALJ Erred by Relying on VE Chilleri's<br>Testimony Despite an Unresolved Reasoning Level Conflict</u>

Mr. Diaz argues that the ALJ's conclusion that Mr. Diaz can engage in other

work that exists in the national economy is not supported by substantial evidence

because the ALJ failed to resolve an apparent conflict between VE Chilleri's

testimony and the DOT. Mr. Diaz asserts that the ALJ failed to comply with SSR

00-4p because the ALJ failed to ask VE Chilleri about an apparent conflict

between the VE's testimony that an individual with the RFC assessed by the ALJ

could engage in work as information clerk (DOT #237.367-046), credit

authorizer/checker (DOT #237.367-014), and video monitor (DOT #379.367-010),

when compared to the DOT job descriptions of each position. He argues that,

according to the DOT, the positions identified by VE Chilleri require greater

reasoning skills than Mr. Diaz's maximum capabilities as assessed by the ALJ, and

that a limitation to simple, routine tasks allows for only level 1 reasoning skills.

He accurately notes that all three occupations identified by VE Chilleri require level 3 reasoning skills.

As noted above, the Social Security Administration has provided no formal guidance on this issue. One internal memorandum, however, observes that even though GED levels are not typically evaluated during disability proceedings, they should be considered when they *appear* to conflict with an ALJ's RFC assessment. SSM 09-2139.

In *Zirnsak v. Colvin*, the Third Circuit recognized a split of authority as to whether a GED reasoning level conflict is an error that always requires remand, or whether such a conflict can be deemed harmless where there is other evidence in the record that suggests the claimant can engage in occupations with a reasoning level of 3 despite being limited to simple, routine work. 777 F.3d 607, 617-619 (3d Cir. 2014). The Court in *Zirnsak* adopted the latter position, and articulated three factors which it found relevant to its analysis of whether a reasoning level conflict resulted in harm to the claimant: (1) whether the claimant argued that he or she was incapable of performing the jobs identified by the VE, and whether there was evidence in the record that suggests that the claimant had the requisite education and past experience to perform at a reasoning level of 3; (2) whether the inconsistencies between the VE's testimony and the DOT were identified during

44

the administrative hearing; and, (3) whether the occupations listed by the VE were intended to be exhaustive or illustrative. *Id.*; *see also Upshur v. Colvin*, No. 15-5434, __ F.Supp. 3d __, 2016 WL 4059147 (E.D.Pa. Jul. 26, 2016) (applying *Zirnsak* to a reasoning level conflict).

In this case, there is evidence that, before his injuries, Mr. Diaz was capable of functioning at a reasoning level of 3. He completed high school, and his past relevant work was skilled. However, the ALJ conceded in her written decision that, as a result of his credible allegations of pain Mr. Diaz would be limited to simple, routine tasks. Furthermore, the record reflects that VE Chilleri testified that a limitation to simple and routine tasks would preclude the ability to carry-out detailed written and oral instructions. *Admin. Tr. 665*; *Doc. 6-10 p. 82*. Based on the descriptions in the DOT, it appears that a reasoning level 3 required the ability to carry out detailed but uninvolved instructions. Thus, although there is evidence that Mr. Diaz could, at one point, engage in work requiring a reasoning level of three, the ALJ found this was no longer the case when she recognized that Mr. Diaz's credible reports of pain restricted him to the performance of simple routine tasks in a low stress environment. *See Admin. Tr. 596; Doc. 6-10 p. 13*. As such, we find that Mr. Diaz's past performance of work at or above this level is not

enough to support a determination that he retained that capacity during the relevant period.

Second, Mr. Diaz attempted to point out the inconsistency between VE Chilleri's testimony and the DOT to the ALJ. When he did so, Mr. Diaz's counsel was instructed to "move on" and the ALJ found that the inconsistency was irrelevant without allowing Mr. Diaz an opportunity to develop the issue. *Admin. Tr. 665-666; Doc. 6-10 pp. 82-83*. In her written decision the ALJ explained her resolution of this issue as follows:

> There is no longitudinal evidence that the claimant has complained or sought evaluation or treatment for any intellectual or cognitive complaints. Thus, no medically determinable mental impairment or cognitive/intellectual impairment has been established in the evidence of record. While counsel for the claimant, during the vocational testimony, raised the issue of GED level, this consideration was overruled by the undersigned. It is clear there is no factual basis or actual evidence of record to support the establishment of any cognitive or intellectual impairment upon which GED levels would be implicated and which would support any requirement that the GED level be considered or restricted as a relevant component to the determination of the claimant's ability to perform unskilled work activity hereinafter. The evidence shows that the claimant is a high school graduate who has a history of receiving additional job training, including certificates for such training. His past relevant work was identified to be skilled. There is no evidence of record establishing any cognitive or intellectual deficits. As such, the claimant has failed to support his burden of proof to support any limitation to his GED level.

*Admin. Tr. 595; Doc. 6-10 p. 12.*  The ALJ did not attempt to elicit any reasonable explanation for the apparent conflict in this case from VE Chilleri.  Further, we find no evidentiary support for the ALJ's assessment that a claimant's GED reasoning level may only be adversely affected by medically determinable cognitive impairment, rather than by pain alone.  As such, because this conflict was apparent, and the ALJ did not elicit a reasonable explanation from VE Chilleri as to how Mr. Diaz could perform these occupations despite his limitation to simple tasks, we find that the ALJ's resolution of this issue is not supported by substantial evidence and was not properly resolved pursuant to SSR 00-4p.

Third, we must assess whether VE Chilleri's testimony may constitute substantial evidence despite a conflict with one or more occupations.  For example, in *Jones v. Barnhart,* the Third Circuit found that a VE's testimony was still substantial evidence despite a conflict with the DOT where (1) the conflict did not exist with respect to all of the occupations identified and (2) the VE's testimony was illustrative rather than exhaustive.  364 F.3d at 506.  VE Chilleri's testimony does suggest that the occupations she identified were "samples," thus could reasonably be viewed as exemplary rather than exhaustive.  However, unlike in *Jones*, the conflict between VE Chilleri's testimony and the DOT exists with respect to all occupations identified.  Absent a VE's identification of at least one

47

occupation that did not include an unresolved conflict with the DOT, the fact that VE Chilleri's testimony was exemplary rather than exhaustive in this case does not, by itself, constitute substantial evidence.

Accordingly, we are compelled to remand this case for a new administrative hearing.   On remand, the ALJ should resolve the outstanding reasoning level conflict in accordance with SSR 00-4p.

With respect to Mr. Diaz's remaining arguments, we also find that the ALJ erred by failing to acknowledge the function report submitted by Mrs. Diaz, and clearly explain and support the basis for her determination that Mr. Diaz could engage in work on a regular and continuing basis.   We find that Mr. Diaz's remaining arguments lack any obvious merit, but to the extent that any error may exist it can be remedied on remand.

## V.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that Mr. Diaz's request for relief be GRANTED and the Commissioner's final decision denying Mr. Diaz's claim be VACATED as follows:

1.   The final decision denying Mr. Diaz's claim for disability insurance benefits under Title II of the Social Security Act is vacated, and this case is remanded to the Commissioner to conduct a timely

administrative hearing and issue a timely decision pursuant to sentence four of 42 U.S.C. §405(g);

2.     Final judgment shall be entered in favor of Albert Diaz, Jr. and against the Commissioner of Social Security; and,

3.     The clerk of court shall close this case.


Dated: March 22, 2017

<em><strong>S/Susan E. Schwab</strong></em><br>
Susan E. Schwab<br>
Chief United State Magistrate Judge